NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re:<br><br>LYNX ASSOCIATES, L.P.<br><br>Debtor. | Civil Action No. 07-5035 (JAG)<br><br>**OPINION** |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on an appeal filed by Remainderman RM 14 FK Corporation ("Remainderman" or "Appellant"), seeking review of an order ("Allocation Order") issued by the United States Bankruptcy Court for the District of New Jersey (Winfield, J.) on September 5, 2007. The Allocation Order granted a motion filed by Lynx Associates, L.P. ("Lynx" or "Appellee") and compelled the distribution of proceeds of a sale of assets on a pro rata basis. This Court shall affirm the Allocation Order requiring a pro rata distribution of the proceeds.

### I. BACKGROUND

The events that form the backdrop for this case involve a series of complex business transactions. Rather than attempting to paraphrase the history of these transactions, this Court will rely upon the factual background set forth in the Fourth Amended and Restated Disclosure

1

Statement Regarding Plan of Reorganization for Lynx Associates, L.P. (Fourth Am. and Restated Disclosure Statement Regarding Plan of Reorganization for Lynx Assoc., L.P. (hereinafter "Reorg. Plan"), attached as Ex. B to Remainderman RM 14 FK Corp.'s Br. on Appeal from Allocation Order (hereinafter "Remainderman's Br.").)

## 2   HISTORY OF THE DEBTOR AND THE BANKRUPTCY FILING

The Debtor [Lynx Associates, L.P.] owned estates for years, expiring on January 2, 2011, in thirteen (13) commercial properties (each a "<u>Property</u>," and collectively, the "<u>Properties</u>") located in nine (9) states (Arizona, California, Kansas, Missouri, Nebraska, Nevada, Ohio, Texas and Utah) and a fee interest in all buildings and improvements on the Properties. In addition, the Debtor has the right (exercisable in 2001) to lease the Properties for an initial term of three (3) years, and for fifteen (15) consecutive renewal terms, aggregating seventy-seven (77) years.

### 2.1   History of Debtor and Description of Debtor's Business Purpose

In 1983, Kmart Corporation ("Kmart") sold to Lynx Properties Corporation ("<u>LPC</u>") the Properties (along with a fourteenth parcel of real property located in North Bergen, New Jersey) for an aggregate acquisition price of approximately $35,656,566.

LPC, in turn, leased the Properties back to Kmart under [a] separate "triple net" operating lease agreement for each Property (the "<u>Operating Leases</u>").

LPC borrowed most of the purchase price for the Properties from Kmart (the loan for each Property, a "<u>Mortgage Loan</u>," and collectively for the Properties, the "<u>Mortgage Loans</u>,"). None of the Mortgage Loans has a cross-default or a cross-collateralization provision, and each Mortgage Loan is a non-recourse obligation of the Debtor.

Each Mortgage Loan is evidenced by a promissory note dated November 15, 1983 (individually, a "<u>Note</u>" and collectively,

the "Notes"). Each of the Notes is separately secured by the following (the "Security Documents"): (i) a fee mortgage or deed of trust on the Property, and (ii) an assignment of the Operating Lease for such Property. The Notes were issued in an original aggregate principal amount of $35,300,000 with an interest rate of 13.5% per annum. The Notes had a maturity date of January 1, 2009 and could be prepaid on or after January 1, 1999, subject to a declining prepayment premium.

Kmart, in turn, sold participation interests in the Mortgage Loans to investors. Those interests were evidenced by certificates issued to the investors. National Bank of Detroit ("NBD") acted as Trustee for the certificate holders under a trust indenture, and the Notes and Security Documents were assigned to NBD.

In 1984, LPC conveyed its interests in the Properties to various entities as follows:

(A) LPC leased its interests in the Properties under a single lease to Malease 14 FK Corp. ("Master Lessee") and transferred all of its interests in the Operating Leases (as landlord thereunder) to the Master Lessee.[1]

(B) LPC conveyed to Debtor (i) an estate for years in each of the Properties, which estate expires on January 2, 2011 (individually, an "Estate for Years" and collectively, the "Estates for Years") and (ii) a fee interest in all buildings and improvements on the Properties.

(C) LPC conveyed to RM 14 FK Corp. (the "Remainderman") a remainder interest in the fee of each property, subject to the Operating Leases, the interests of the Master Lessee, the Estates for Years held by Debtor and the Security Documents. Concurrently with this transaction, the Remainderman granted Debtor an option (exercisable following expiration of the Estates for

---

[1] Malease 14 FK Corp. was subsequently converted into Malease 14 FK, LLC. The Debtor is the owner of Malease 14 FK, LLC (both of [the] Malease entities are referred to as "Master Lessee").

>> Years in 2011) to lease each Property for "an initial term of three (3) years, and for fifteen (15) consecutive renewal terms, aggregating seventy-seven (77) years."
>
> (D) On June 16, 1984, the Debtor, the Master Lessee and the Remainderman executed fourteen three party agreements (the "Three Party Agreements") – one for each Property.
>
> In 1999, the Debtor obtained a modification of the payment terms of the Mortgage Loans held by NBD, as contemplated by the Three Party Agreements. . . .
>
> As a result of the 1999 modification transaction, (1) the Mortgage Loans were held by Bank One as Trustee for [the new certificate holders], (2) the interest rate on the Notes was reduced to 10.07% per annum, (3) the principal debt was $40,150,000 in the aggregate, of which $35,300,000 was due on the Notes and $4,850,000 was due on the Additional Loan note, and the Mortgage Loans were self-liquidating and will mature on January 1, 2009, prior to the expiration of the Estates for Years.
>
> **2.3   Events Leading to the Commencement of this Case**
>
> On January 1, 2002, the Master Lessee failed to make a $287,481 semi-annual payment to Debtor.
>
> On January 22, 2002, Kmart filed a petition under Chapter 11 of the Bankruptcy Code.
>
> On January 24, 2002, the Master Lessee commenced a case under Chapter 11 of the Bankruptcy Code.
>
> On July 1, 2002, the Master Lessee and Debtor entered into a Stipulation and Order Resolving Issues Relating to the Master Lease and Dismissing Bankruptcy Case (the "Stipulation"). Pursuant to the Stipulation, the Debtor became the owner of Master Lessee.[2]

---

[2] Immediately prior to this time, the owner of the Master Lessee and the owner of the Remainderman were the same.

> On November 5, 2002, the Mortgage Loan secured by a Property located in North Bergen, New Jersey was satisfied, and that Property was transferred by the Debtor, leaving the Notes secured by the Security Documents remaining on the thirteen Properties in nine states.

(Reorg. Plan ¶ 2.)

The interpretation of paragraph six of the Stipulation is the crux of the dispute among the parties giving rise to the appeal currently pending before this Court.[3] The sale of the North Bergen property resulted in proceeds[4] totaling approximately $1.34 million. (Allocation Order

---

[3] Paragraph 6 of the Stipulation provides that "[a]ll recoveries from the Kmart Claims, less legal fees actually incurred by the Partnership in connection therewith, including with respect to any Property which has been abandoned by the Partnership, shall be distributed in accordance with the order for the priority of payments specified in the existing Transaction Documents and mortgage/security documents used first, to pay down the principal and interest on the mortgage debt on each such Property, provided however, if any surplus proceeds exist after the mortgage debt relating to a specific Property is satisfied, then to pay the mortgage debt on the other Properties on a ratable basis." (Stipulation ¶ 6.)

[4] The proceeds are not derived directly from the sale of the North Bergen property, but rather arise from Lynx's claims in the Kmart bankruptcy. Specifically, under the terms of the Stipulation, Malease 14 FK Corp. assigned its interest in any claims against Kmart arising from the breach or rejection of any of Kmart's leases to Lynx. (Stip. ¶ 3.)

> As a result of Kmart's rejection of the leases, [Lynx] filed proofs of claim in the Kmart bankruptcy for damages it suffered as a result of said rejection. Kmart disputed the amounts claimed but ultimately agreed to settle [Lynx's] claim at more than 93% of the amount submitted in the proofs of claim. . . .
>
> On April 13, 2005, [Lynx] filed a motion with the Bankruptcy Court seeking approval of the settlement with Kmart. The resolution provided for the allowance of lease rejection claims totaling the amount of $12,052,428.61. The settlement allocated the claim between [Lynx's] Properties (including the property located in North Bergen, New Jersey sold by [Lynx] prepetition and excluding the Groveport, Ohio Property which lease was assumed by Kmart). . . . [T]he Bankruptcy Court approved the

5

¶ 3.) The parties disagree on how to distribute the surplus due to a dispute over the meaning of "ratable" in paragraph 6 of the Stipulation.

On July 3, 2007, Lynx filed a motion for an Order Compelling Allocation of Proceeds in the bankruptcy court. After briefing, Judge Novalyn L. Winfield heard oral argument on August 21, 2007, and subsequently entered the Allocation Order on September 5, 2007. In that order, Judge Winfield granted Lynx's motion and ordered the North Bergen proceeds to be allocated on a pro rata basis among the remaining properties based on the outstanding mortgage balances. The dispersal of the proceeds on a pro rata basis would mean that the corpus of $1.34 million would be divided among the thirteen properties based on a proportion derived from the relative mortgage amounts. This order is the subject of the appeal pending before this Court.

Remainderman raises three issues on appeal.

1. Whether the Bankruptcy Court erred in determining that the word "ratable", [sic] as used in paragraph 6 of that certain "Stipulation and Order Resolving Issues Relating to Master Lease and Dismissing Bankruptcy Case" ("Stipulation") entered on July 1, 2002 in Malease 14 FK Corp., Case No. 02-80587 in the United States Bankruptcy Court for the Eastern District of New York, is properly interpreted as requiring a pro rata allocation of certain proceeds of the Debtor's sale of Kmart securities ("Proceeds") to payment of obligations secured by the real properties and in the amounts identified in the Order.

2. Whether the Bankruptcy Court erred in not determining that the word "ratable"

---

settlement with Kmart. The distribution in the Kmart bankruptcy case is in the form of securities of the reorganized Kmart. To date [Lynx] has monetarized the securities received. The net sale proceeds of the Kmart securities were $11,293,879.87 on the first distribution, $1,100,892.37 on the second distribution and approximately $818,000 on the third distribution. The Trustee has a security interest in the proceeds and has applied the proceeds received among the various mortgages.

(Reorg. Plan ¶ 3.4.)

6

as used in paragraph 6 of the Stipulation requires that the Proceeds be allocated to pay the obligations secured by the real properties identified in the Order in a manner that is adjusted properly as to relative magnitude, amount or degree of the value of the properties to the Debtor's chapter 11 estate, so as to be put in a suitable relation.

3. Whether the Bankruptcy Court erred in not determining that the word "ratable" as used in paragraph 6 of the Stipulation requires that the Proceeds be allocated to pay the obligations secured by the real properties identified in the Order in a manner which is not arbitrary, capricious, whimsical or unreasonable.

(Remainderman's Am. Designation of R. and Issues on Appeal 3.)

## **JURISDICTION**

This Court has jurisdiction to hear this case under 28 U.S.C. § 158(a) which states, in pertinent part, that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges." The order of the bankruptcy judge in the instant case is final, and therefore reviewable, pursuant to 28 U.S.C. § 158(a)(1).[5] "Pursuant to FED. R. BANKR. P. 8013, a federal district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Ryker

---

[5] The Third Circuit has stated that an order is final for purposes of appeal if "the issue [is] purely one of law, requiring no further factual or legal development." U.S. v. Nicolet, 857 F.2d 202, 206 (3d Cir. 1988). In determining whether a bankruptcy order is final for purposes of appeal, the Third Circuit has also considered other factors, such as "(1) '[t]he impact on the assets of the bankrupt estate; (2) [the] [n]ecessity for further fact-finding on remand; (3) [t]he preclusive effect of [the Court's] decision on the merits of further litigation; and (4) [t]he interest of judicial economy.'" In re Owens Corning, 419 F.3d 195, 203 (3d Cir. 2005) (quoting Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV, 229 F.3d 245, 250 (3d Cir. 2000)). The most important factor is the impact the decision will have on the bankruptcy estate. In re Market Square Inn, Inc., 978 F.2d 116, 120 (3d Cir. 1992). Here, allowing the appeal to proceed would promote judicial economy by establishing finality with respect to a significant asset of the bankruptcy estate. In addition, no further fact finding is required in order to reach a decision on this matter. Therefore, this Court concludes that the Allocation Order is final for purposes of appeal.

v. Current, 338 B.R. 642 , 646 (D.N.J. 2006).

In bankruptcy appeals, district courts, pursuant to FED. R. BANKR. P. 8013, should uphold findings of fact unless they are clearly erroneous. FED. R. BANKR. P. 8013; Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir. 1988). A finding of fact is clearly erroneous when, although there is evidence to support it, in consideration of the entire record, the reviewing court is left with the definite and firm conclusion that a mistake has been committed. United States v. Gypsum Co., 333 U.S. 364, 395 (1948). By contrast, in reviewing orders of the bankruptcy court, this Court reviews questions of law de novo. See In re Continental Airlines, Inc., 203 F.3d 203, 208 (3d Cir. 2000) (citing Manus Corp. v. NRG Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 188 F.3d 116, 122 (3d Cir. 1999)).[6]

Appellant is seeking review of legal conclusions made by the bankruptcy judge, and thus review by this Court is de novo.

---

[6] At oral argument, Judge Winfield questioned whether the underlying motion should have been brought under 11 U.S.C. § 105 or as an adversarial proceeding. She concluded that the use of § 105 was acceptable, and this Court agrees. The Third Circuit has observed that "[s]ection 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code. However, section 105(a) has a limited scope. It does not 'create substantive rights that would otherwise be unavailable under the Bankruptcy Code.'" In re Continental Airlines, Inc., 203 F.3d 203, 211 (3d Cir. 2000) (quoting United States v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992)). Expanding upon this reasoning, the Third Circuit has stated that "§ 105(a) is a powerful tool, but that it operates only within the context of bankruptcy proceedings." In re Joubert, 411 F.3d 452, 455 (3d Cir. 2005). In the instant case, the Bankruptcy Court did not abuse the scope of its discretion under § 105(a) in hearing this dispute, since the definition of "ratable," as used within the Stipulation, is intimately tied to the bankruptcy proceeding. Further, the Bankruptcy Court concluded that efficiency and judicial economy would be served by proceeding under § 105 rather than requiring the parties to commence an adversary proceeding. (Tr. 3:4-3:23, 32:19-33:2, Aug. 21, 2007.)

## **LEGAL STANDARD**[7]

The question presently before this Court essentially involves the interpretation of an agreement.[8]

---

[7] Appellant asserts that New York law governs the interpretation of the Stipulation. (Remainderman's Br. 13.) Appellee does not challenge this assertion, but rather cites New York law with respect to the definition of the term "ratable" (Appellee Lynx Associates, L.P.'s Response to Remainderman RM 14 FK Corp.'s Br. on Appeal from Allocation Order (hereinafter "Lynx Resp.") 13-14), while citing New Jersey law with respect to contract interpretation principles (Lynx Resp. 15-16). The Bankruptcy Court relied upon New York law in interpreting the contract. (Tr. 32:1-32:2, Aug. 21, 2007.) As to the definition of "ratable," the Bankruptcy Court considered Supreme Court decisions and the definition set forth in Black's Law Dictionary. Additionally, in an opinion in a related adversary proceeding that also involved the interpretation of paragraph 6 of the Stipulation, the Bankruptcy Court stated that "[b]oth parties concur that the Malease Stipulation is a contract governed by New York law." (Lynx Assoc., L.P. v. RM 14 FK Corp., Adv. No. 05-2531, slip op. at 10 (N.J. Bank. April 24, 2007.)

To determine which law to apply in contract cases, New Jersey has adopted the standard in RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971). See Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 760 (3d Cir. 1991) (citing State Farm Mutual Automobile Insurance Co. v. Estate of Simmons, 84 N.J. 28, 37 (1980)). That standard requires this Court to consider the following factors: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Id. The courts of New York consider the same factors in determining which law to apply in contract cases, giving the heaviest weight to the places of contracting and performance. Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (citing In re Allstate Ins. Co. and Stolarz, 81 N.Y.2d 219, 227 (1993)). Here, although the parties provide a dearth of argument or evidence on the issue, it appears that the contract was negotiated, signed, and performed in New York. (Remainderman's Br. 13.) Considering these factors, and the parties' apparent prior agreement before the Bankruptcy Court that New York law applies, this Court will apply New York law.

[8] The Stipulation includes a provision that "any action or proceeding to enforce the terms of this Stipulation and Order shall be brought in the Bankruptcy Court which shall have jurisdiction to resolve any dispute arising from or relating to this Stipulation and Order." (Stip. ¶ 17.) The parties did not bring this provision to the attention of either Judge Winfield or this Court. Since Lynx, a party to the Stipulation, sought interpretation of the Stipulation in the New Jersey bankruptcy court, rather than the bankruptcy court in the Eastern District of New York, as provided by the Stipulation, this Court concludes that Lynx consented to the jurisdiction of the courts in New Jersey to preside over this matter. Similarly, since Remainderman did not

9

Under New York law, agreements must be construed to "effectuate the intention of the parties as evidenced by the language they used, and [courts] are therefore bound to enforce the terms of the agreement as set down in an integrated, written instrument." Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir. 2000) (citing Wallace v. 600 Partners Co., 658 N.E.2d 715 (N.Y. 1995) and W.W.W. Assocs.v. Giancontieri, 566 N.E.2d 639 (N.Y. 1990)). Courts ascertain "intent 'from the plain meaning of the language employed' in the agreements, rather than from extrinsic evidence." Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737 (2d Cir. 1999) (quoting Tigue v. Commerical Life Ins. Co., 631 N.Y.S.2d 974, 975 (N.Y. App. Div.1995)). "When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties." Scholastic, 259 F.3d at 82 (citing Curry Rd. Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir. 1990)).

"Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F. Supp. 987, 994 (S.D.N.Y. 1968)). "If contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous." Scholastic, 259 F.3d at 82. "A contract is ambiguous where reasonable minds could differ on

---

question the jurisdiction of the courts in New Jersey, this Court concludes that Remainderman consented to the jurisdiction of those courts.

what a term means, but no ambiguity exists where the alternative construction would be unreasonable." Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996) (citing Van Wagner Advertising Corp. v. S.&M. Enters., 492 N.E.2d 756 (1986) and Mandelblatt v. Devon Stores, Inc., 521 N.Y.S.2d 672 (N.Y. App. Div. 1987)). "[E]xtrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993).

## ANALYSIS

As stated by the parties, this dispute concerns the meaning of the term "ratable," as it is employed in the Stipulation. (Stipulation ¶ 6.)

Remainderman argues that Black's Law Dictionary,[9] as supplemented by the decision in Glucksman v. Bd. of Ed. of City of New York, 164 N.Y.S. 351 (N.Y. Mun. Ct.) rev'd on other grounds, 167 N.Y.S. 1075 (N.Y. App. Div. 1917), defines "ratable" as meaning a rate "based upon a constant ratio; adjusted to a due relation; adjusted properly as to relative magnitude; put in suitable relation; and not one which is arbitrary, capricious, whimsical, or unreasonable."[10]

---

[9] Remainderman fails to indicate upon which edition of Black's Law Dictionary its argument relies. Based upon a review of past editions of Black's Law Dictionary, this Court surmises that Remainderman relies upon the 4th Edition of Black's, published in 1968. However, the current edition of Black's Law Dictionary is the 8th Edition, published in 2004. The definition of "ratable" in the current edition of Black's Law Dictionary is "1. Proportionate <ratable distribution>. 2. Capable of being estimated, appraised, or apportioned <because hundreds of angry fans ran onto the field at the same time, blame for the goalpost's destruction is not ratable>. 3. Taxable <the government assessed the widow's ratable estate>. See PRO RATA." Black's Law Dictionary 1289 (8th ed. 2004). While the 1968 definition prompts this Court to affirm the Bankruptcy Court's conclusion, this Court notes that the current definition even more clearly defines "ratable" and supports the conclusion of the Bankruptcy Court and it is the one upon which this Court will rely.

[10] While Remainderman wishes to supplement the definition, the 4th Edition of Black's Law Dictionary defines "ratable" as "[p]roportional; proportionately rated upon a constant ratio

(Remainderman's Br. 8 (quoting Glucksman, 164 N. Y. Supp. at 359).) Remainderman believes that application of this definition requires this Court to consider extrinsic evidence, supplied in the declaration of Lawrence Kadish, in order to determine how the proceeds should be divided among the properties. (Remainderman's Br. 8.) That is, in order to achieve a non-arbitrary distribution of the proceeds, Remainderman urges this Court to consider the loan-to-value ratio of each of the properties, in order to determine how to divide the proceeds. Remainderman further argues that the distribution, as ordered by the Bankruptcy Court, results in the waste of $483,000, which will be paid on mortgages of properties that have mortgage amounts that exceed the fair market value of those properties. (Id. at 10.) Essentially, according to Remainderman, these payments result in an irrational windfall of $483,000 for the Trustee. (Id. at 14.) Additionally, according to Remainderman, these payments grant Trustee rights that do not exist under the Stipulation. (Id. at 12.)

Lynx argues that "ratable" means "proportionate," and as such, the distribution of the proceeds based upon the mathematical calculation of the proportions of the outstanding mortgage amounts is not "arbitrary, capricious, whimsical, or unreasonable." (Lynx Resp. 12.) Lynx further argues that since the Stipulation is unambiguous, outside evidence of the parties' intent should not be considered by this Court. (Id. at 16.)

The Bankruptcy Court concluded that the meaning of "ratable" is clear and unambiguous, and means "pro rata." As a result, the Allocation Order requires the proceeds be "allocated

---

adjusted to due relation. Glucksman v. Board of Education of City of New York [sic], Mun. Ct., 164 N.Y.S. 351, 359. According to a measure which fixes proportions. It has no meaning unless referable to some rule or standard, and never means equality or equal division but implies unequal division as between different persons. Chenoweth v. Nordan & Morris [sic], Tex. Civ. App., 171 S.W.2d 386, 387." Black's Law Dictionary 1427 (4th ed. 1968).

among the mortgage balances of the Debtor's other Properties on a pro-rated basis." (Allocation Order ¶ 3.)

The first step in this Court's analysis requires a determination as to whether "ratable" has a precise meaning or whether it is susceptible to more than one meaning. See Scholastic, 259 F.3d at 82. This Court concludes that "ratable" has a definite and precise meaning that is not reasonably susceptible to differing interpretations, and therefore is not ambiguous.[11] In fact, both parties agree that "ratable" requires a proportionate division based on a non-arbitrary, clearly articulated formula. (Remainderman's Br. 11 ("the allocation would be adjusted properly as to relative magnitude and put in a suitable relation and not one which is arbitrary, capricious, whimsical or unreasonable"); Lynx Br. 12 (Lynx "does not dispute that portion of Remainderman's definition of the term 'ratable' from Glucksman.").)

The Bankruptcy Court ordered just such an allocation based on a mathematical formula derived from the mortgage debt. As such, this Court concludes that the language of the Stipulation is unambiguous as to the meaning of the word "ratable." Therefore, the Bankruptcy Court was correct in interpreting "ratable" to require a pro rata allocation of the proceeds to pay the mortgages.

Remainderman's second argument focuses on the question of what formula to apply in

---

[11] For over one hundred years, courts have held that "ratable" requires a proportionate or pro rata distribution. See, e.g., American Surety v. Bethlehem Nat. Bank, 314 U.S. 314, 317-18 (1941) ("'ratable' distribution requires that dividends be declared proportionately upon the amount of all claims as they stand on the date of insolvency"); Merrill v. Nat. Bank of Jacksonville, 173 U.S. 131, 143 (1899) ("The distribution is to be 'ratable' on the claims as proved or adjudicated; that is, on one rule of proportion applicable to all alike."). Additionally, Black's Law Dictionary has consistently defined "ratable" as meaning "proportionate," Black's Law Dictionary 1289 (8th ed. 2004), or "proportional," Black's Law Dictionary 1427 (4th ed. 1968).

13

distributing the proceeds.  The dispute, though couched in terms of the definition of "ratable," is actually more accurately depicted as questioning what criterion should form the basis of the non-arbitrary division formula.  Remainderman urges a distribution based on the relative values of the properties, and presents extensive extrinsic support for its reasoning.[12]  Before this Court can consider that extrinsic evidence, it must find that the Stipulation is ambiguous.  This Court concludes that the Stipulation is not ambiguous and therefore will not consider Remainderman's extrinsic evidence.

The Stipulation is clear and unambiguous on what criterion should be used to distribute the proceeds; namely, "the mortgage debt on the other Properties."  (Stip. ¶ 6.)  No mention is made of the value of the properties in paragraph 6.  "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." Sayers v. Rochester Tel. Corp., 7 F.3d 1091, 1095 (2d Cir. 1993).  Here, Remainderman is not urging a conflicting interpretation of the agreement, but rather asks this Court to insert new language into the agreement. This Court cannot do so.  Examining the clear language as written, this Court concludes that the Stipulation requires the proceeds to be divided based upon the relative values

---

[12] Alternatively, this Court could interpret Remainderman's argument to be that ratable distributions can only be made based upon the value of properties.  This is simply not so. "Ratable" has been used to describe the proportion of reimbursement a tortfeasor seeks in an action for contribution against another liable party, McFall v. Compagnie Maritime Belge S.A., 107 N.E.2d 463, 470 (N.Y. 1952); the court's allocation of waterfront area by balancing the conflicting riparian rights of owners of adjoining estates, Muraca v. Meyerowitz, 818 N.Y.S.2d 450, 456 (N.Y. App. Div. 2006); the distribution of counsel fees from non-client beneficiaries of a petitioner's litigation, Kantrowitz, Golhamer & Graifman, P.C. v. New York State Elec. & Gas Corp., 810 N.Y.S.2d 550, 554 (N.Y. App. Div. 2006); and rent escalation according to operating expenses for the rented property, P.A. Building Co. v. City of New York, 760 N.Y.S.2d 154, 155-56 (N.Y. App. Div. 2003).  Based on this small sampling of opinions, it is apparent that "ratable" can be used to describe the proportionate division of a variety of items, and that the proportion can be based on a variety of criteria, not only fair market value of properties.

of the mortgage debt.  Therefore, the Bankruptcy Court did not err when it determined that the proceeds should be allocated according to the outstanding mortgage debt, rather than the relative value of the properties.

Remainderman's third issue on appeal asks this Court to consider whether the Bankruptcy Court erred by not determining that "ratable" "requires that the Proceeds be allocated to pay the obligations secured by the real properties . . . in a manner which is not arbitrary, capricious, whimsical or unreasonable."  (Remainderman's Am. Designation of R. and Issues on Appeal 3.) Remainderman persists in its attempt to create disagreement where none exists.  Lynx, the Bankruptcy Court, and this Court all agree with Remainderman that a ratable distribution is one that is not arbitrary, capricious, whimsical, or unreasonable.  Remainderman argues that distributing the proceeds based on the relative outstanding mortgage amounts results in an arbitrary, capricious, whimsical, or unreasonable distribution, since $483,000 of the proceeds will be used to pay down the debt on properties with loan amounts that exceed the fair market value of the property.  While this method of distribution might not result in the most economically advantageous distribution in Remainderman's view, that does not make the distribution arbitrary, capricious, whimsical, or unreasonable.  The distribution is based on a clearly defined criterion – the relative outstanding mortgage debt – to which the parties agreed in 2002.  While the parties might have negotiated the agreement differently in the current economy, this Court cannot and shall not rewrite their agreement.[13]

---

[13] Parenthetically, Remainderman is correct in stating that "the parties to the Stipulation are free to modify the Surplus Proceeds' allocation to reflect economic reality." (Remainderman's Br. 11.)  However, the parties have failed in their efforts to renegotiate the distribution of the proceeds.  (Tr. 5:8-6:11, 25:7-25:19, Aug. 21, 2007.)  As such, this Court must look only at the Stipulation, as it is written.

Remainderman also urges this Court to consider the agreement as a whole, and to read paragraph 6 in conjunction with paragraph 8a, which provides, in part, that "[t]his Stipulation and Order shall not adversely affect the rights of the Trustee, or confer any additional rights on the Trustee." (Stip. ¶ 8a.) Remainderman argues that distribution of the proceeds based on the mortgage amounts results in a windfall to the Trustee, and therefore violates paragraph 8a of the Stipulation by conferring additional rights on the Trustee.

A contract must be read in its entirety. Sayers, 7 F.3d at 1095 ("Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.' By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous." (quoting W.W.W. Assocs., 335 N.E.2d at 642)). However, this Court disagrees with Remainderman's assertion that distribution of the proceeds, as provided by the Allocation Order, will result in a windfall to the Trustee. Under either the terms of the Allocation Order or the Remainderman's proposed distribution, all of the proceeds will be paid to the Trustee, as the holder of the mortgage notes on all of the properties.

While this distribution might result in the Trustee receiving more money regarding the properties with mortgage amounts that exceed the fair market value, this Court cannot designate those payments as a windfall that confers additional benefits on the Trustee. Rather, the Trustee is simply receiving payment on the outstanding amounts owed on the mortgages, a result also required by paragraph 8a; namely, that the Trustee's rights should not be adversely affected by the terms of the Stipulation. As such, this Court concludes that, reading the Stipulation as a whole, division of the proceeds, as set forth in the Allocation Order, is not arbitrary, capricious,

whimsical, or unreasonable.

## CONCLUSION

For the reasons stated above, this Court concludes that the Bankruptcy Court did not err in determining that the word "ratable" requires a pro rata allocation of the proceeds among the properties.  Additionally, this Court concludes that the Bankruptcy Court did not err in determining that the word "ratable," as used in paragraph 6 of the Stipulation, requires the distribution of the proceeds based on the mortgage amounts, rather than the property values.  Finally, this Court concludes that the Allocation Order does not result in a division of the proceeds in an arbitrary, capricious, whimsical, or unreasonable manner.


Dated: July 7, 2008

                                    S/Joseph A. Greenaway, Jr.
                                    JOSEPH A. GREENAWAY, JR., U.S.D.J.